Lawyers who are going to argue the case, please step forward and give us your names. My name is Edward Willer. I'm called to meet you on behalf of the clients. I'm sorry, can you spell your last name? W-I-O-L-E-R. Robert Winston on behalf of the Metropolitan Water Reclamation District. Okay. A couple of things. One is you will each have 20 minutes aside. I will ask you if you would like to reserve any part of that 20 minutes for rebuttal. Five minutes would be all right. Of course. And the clerk will try to stand up when your time is up so that you know, and at that point we can try to wrap up unless there's a question pending. Secondly, that microphone does not amplify, it only records, so please keep your voices up nice and loud. All right? Whenever you're ready. May I please, clerk? Counsel? Andrew? At the onset, it's important to know that the second amendment complaint initially contained allegations, not only of supervisory allegations, but non-supervisory lawful wanton misconduct. Now, at the time of the grant of the MSJ motion, the trial court had already, in April 2014, granted a 2-6-15 motion dismissing the two subparagraphs deemed with supervision. Thereafter, in May of 2016, the court denied defendant's 2-6-19-A-9 motion on tort immunity 2-10 in a 4-14 restatement seconded to court. At that time, the court ruled that lawful and wanton is still a matter of question for the jury. Importantly, the court found at that time that the plaintiff did not need to plead a prior accident and that the plaintiff's plea or showing another conscious disregard was sufficient. We distinguished tabularity at that time. There was no cross appeal taken by the MWRB from that ruling. Therefore, the only issue before this court was the MSJ was related to the MWRB's motions for non-supervisory allegations where paragraphs 30B and C were previously dismissed. The court then went on to grant their motion based on cabal versus ESI construction. We submit that the orders granting the MSJ and denial by reconsideration and the order granting the motion, 6-15-8 motion, to dismiss 30B and C and its order with reconsideration, an error should be demanded reversed. First off, there is no discretionary immunity here under 2-201 for MWRB. I'll tell you why. Andrew's injuries did not result from an act performed or omitted by the district in play in determining policy or in the exercise of discretion. I believe the trial court erred when it took this Cabrera holding. And if you look at Cabrera, it's a construction supervision case. It's a 21-page opinion written by Justice Gordon. Much of it goes to other issues. But it also talks about inmate fraud, and I will get to that. But it's a construction supervision case. At the time the motion was granted for summary judgment, there were no supervisory allegations left. It was a construction supervision case. All we had left were failure-to-warrant allegations and non-supervisory allegations to be decided. The trial court erred when it held that forced decisions were policy determinations. And if you look at the memorandum opinion, the trial court ruled when it held that any possible decisions made by the resident engineer concerning safety issues involved balancing competing interests and judgment costs as to what safety measures were needed. I submit to you that possible decisions do not equate to 2201 standards. Okay, but the real decision, and you understand that we could affirm on any basis that made sense to us. And there was a decision made to leave the latter in place, right? That was a decision, arguably a discretionary decision. We don't know if that was a decision, because Mr. Ford testified he never observed the latter. He never saw the latter configuration. Now, that's a good point, because in the Monson case, Justice Barrett went into this litany about dog errands the city dropped out and how he didn't see the area as well. Well, you can't have a discretionary immunity unless you see something under the non-supervisory part of the case. That's the distinction I'm making here before you today. It's a very solid distinction, but it's a meaningful decision, and it leads right into my next point. Now, are you taking the position, in your brief you've always taken the position that the defendant knew of this latter and that it was dangerous? I mean, you say defendant allowed this known danger to persist and disregarded its duty to correct the use of unsafe methods on the job site. So now you're saying that they might not have known? Your Honor, I don't think they met the stringent requirements to show a conscious decision not to remedy the situation. There's a difference that Justice Burt makes in the Monson case. I know counsel's going to get up here and argue that Monson's not a construction site case and so on, but it's a very fine distinction under the tort immunity, and that is the statute. We always come back to 2201 statute. We can't avoid it. Case law defines it to an extent, but it also has a third prong, where the employee, the local public entity employee, has to make a conscious policy decision. What do you do, send a memo or something that I know that this is a dangerous condition and I'm not doing anything? When the decision is not to take action, how do you evidence that decision? The decision was not to take action. He testified under law that he never saw the ladder. But he took a position that they knew. I mean, the federal law was known danger to persist and disregarded its duty. So which is it? He never knew under the tort immunity. I'm basing it on his testimony, and I'll give you his testimony. He never inspected the ladders that were involved in the occurrence. Most importantly, he never evaluated the scene of the occurrence from a safety standpoint. Can you give us a record set on that? Are you looking at the record right now? I'm not looking at the record. I'm looking at his deposition transcript. I can give you the pages. Okay, that's fine. Four depositions, pages 72, pages 90, and pages 110, Your Honor. And specifically, he never inspected the ladders that were involved. That's one thing. That's his testimony. Most importantly, Your Honor, he never evaluated them from a safety standpoint. He didn't know if his MWRD employees saw the ladders in the subject chamber before the occurrence. Now, this homemade ladder configuration in that 39-foot ladder that's going down, it was never evaluated by them. The Supreme Court demands them, and the statute says they have an affirmative defense obligation to show that they actually saw their actual condition. And here we don't hear that. They have not met their third prong of the 2201 standard. But did you allege that they did know about it? No, I should have known. I did allege that. Yes, I did. Well, so how do you? I based this off his testimony, that they didn't. Oh, right. But your cause of action is that they did know, and now you're saying that they didn't. Well, I should have known. I believe I pledged, so. Okay, well, you should have. Right. Now you're saying he didn't. Right. Well, based on his testimony.  I think I've got to rely on what his testimony is, Your Honor. If I could get to my other point that I want to make. Go ahead. But I believe if you look at it, there's no evidence in the record of any employee of the MWRB making a decision-making process with respect to this particular homemade lab or usage. Now, what's interesting is I think what really sheds light on this case is the in-way Chicago-fed decision. Justice Freeman went through the failure to supervise, and he found the contract language provided immunity. Most significantly in that case, he says on cross-appeal, the city, the trial court, first of all, ruled that 221 didn't afford the city any immunity. There was a cross-appeal, and they looked, and they say, that there was a prescribed method for how to repair the tunnel and how to warn class plaintiffs of the tunnel breach. Thus, the city's actions cannot be considered ministerial. And in that case, the Supreme Court went on and did a hair-and-neck analysis as to the non-supervisory allegations. So we've got the supervisory allegations, which can be controlled by the contract language. For the limited purpose of Cabrera, that's what that was. Cabrera is a very limited case that says you look at the contract for supervisory control, they have to give you discretion on the contract. I'm sorry. So you're saying your case at the point that it's before us, supervisory control is out of the case. Is that what you're saying? I think supervisory, I think the ruling in the trial court letter was erroneous on Cabrera because the supervisory sub-allegations were already tossed out. For your case. Right. All we had left in our case to decide this case was the non-supervisory allegations. Failure to warn is one of my allegations. The repair and other things in the sub-allegations, there's a host of them. And counsel kind of wore his motion for summary judgment, the 414 argument, which the trial court had already dismissed. I'm sorry. I am a little confused. Maybe I'm the only one. So your case, you have your supervisory allegations, failure to supervise. Yes. And those are gone by the time we get to summary judgment. That is correct, Your Honor. So what's left in your case is. . . Non-supervisory allegations. Failure to warn. What else? Failure to replace, failure to take precautionary measures. There's an issue of the water out there and things of that nature. Okay. And there's no. . . There is no. . . In the Chicago fed, the Supreme Court did a handbook analysis in getting to where they were. So they made two different rulings, failure to supervise for the contract, failure to non-supervisory allegations, failure to warn, replace, so on and so forth. Here in this case, as opposed to what we have in the Chicago fed, we have a prescribed plan in place. Their plan in place was the MWRB's safety manual and their specifications. There's testimony, unopposed testimony, to enforce those policies. So we've got the ministerial. . . But his actions, Ford's actions were ministerial in nature. And that's why we're saying they are not immune. They were not discretionary in nature. The non-supervisory allegations that Ford conducted were not discretionary. They were ministerial. He had a plan to follow. There are thousands and thousands of pages of blueprints and specifications in this case by the MWRB, letter specifications. You shouldn't have. . . Isn't that what the contract. . . Isn't that the standard? I know I'm only reading the second half of the sentence. Okay. And I know the first half, to use inadequate or unsafe procedures, methods, structures, and equipment will not be permitted. And they may disapprove and reject any of the same, which seem to be unsafe for the work. I don't believe that that includes non-supervisory allegations. I agree with you, Justice Griffin, that it goes to supervisory allegations if they were in the complaint. But the non-supervisory allegations, if you look at the cross-appeal in Inouye, Chicago, Florida, there's a distinction to be made. It's a fine distinction. But they were under marching orders, ministerial duties, to get this thing fixed, and they didn't. Did they have language? Did they have language like that, saying he may disapprove and they may reject? Was it supervisory or not? There's no language for their effect. It's a non-supervisory allegation. I'm looking at your complaint. Where's the distinction in your complaint between the supervisory and the non-supervisory allegations, if there is one? What the trial court did, I'm looking at page 5 and 6, Your Honor, the trial court dismissed on the 615A subsections B and C. All the other allegations remain. The trial court ruled that those were the only two supervisory allegations. And so I look at all these other allegations, A, D through N, as non-supervisory allegations, and there's a distinction to be made. 2201 is the mandate. It's the legislative intent, looking at the type of person and the type of action that the local public employee exercises when he conducts his discretion as to non-supervisory role. In the case that they cite, Cabrera only goes to contractual supervision. I submit that contractual supervision is a very limited case here, Inmate Cabrera v. ESI. If you look at the Monson ruling by Justice Burke, the court said there was no evidence before to establish that there was any evidence of a discretionary maid. Now, if you look at the defendant's claims, and by the way, in their motion and in their reply brief, they make no hearing of analysis. They don't even talk about policy determinations or making a conscious decision. But what they say in their response to the brief in the appellate level, they claim to exercise discretion in determining when to walk the job site, depending on what work was to be done. Stopping work would be inextricably balanced to competing interests. And as to making a conscious decision, determination was the safe use of letters in a non-supervisory capacity, for it testified he didn't have the ability or the knowledge to do so. They ultimately concluded that little question that policy determinations are inherent in any decision by any MWRD, given their role in this big massive multi-million dollar project, treatment center. Now that is just totally in opposite of what Justice Burke wrote.  Nonsense says you have to have a showing that the local public entity looked at the actual site and made a conscious decision to do something or not to do something. But again, you know, another part of your brief, defendant allowed the practice of using job made wooden ladders to traverse upon 29 foot fiberglass ladders without the benefit of access platform on at least six prior tasks. Thanks for the date of the subject. I mean, you hammer away that they knew. I love it. They did not take action. All I can say, Ron, is that there was no conscious decision. Thorpe didn't know about it. He didn't know anything. You're alleging somebody knew. You're saying your allegations are wrong. What are you saying? I think for the purpose, I think we plead that for the purposes of the will from law standard. I understand. You can't have it both ways. True. It's true. I reserve the rest of my time for the above. Unless you have any other questions. Give him more credit. Thank you. If it may please the court, counsel, I've been listening to counsel's argument and he's stating that Chicago flood litigation and Cabrera versus ESI consultants are supervisory cases or non-supervisory cases. And if you look at the Cabrera decision, it says, count one alleges that the city had a presence on the project and was in control of the work, had authority over the means used to perform the work, had authority over safe work practices, and had a duty to exercise reasonable care to avoid the creation and slash or existence of hazardous conditions at the work site. That, to me, is supervision. Now, if you look at 2-201, I don't see the word supervision in that statute. It says if you, if a public employee does discretionary acts, making a policy decision, they are immune, absolute immunity from liability. Okay, where's the discretionary act? The discretionary act in this case, Your Honors, and I think you have to make a distinction between interstate Chicago flood litigation at Cabrera and the cases that plaintiff is citing in his brief. Because we have a construction case here. And the Supreme Court and the Appellate Court seem to have taken and said, look, you have to look at the contract language to see what the contract says. In Cabrera and in interstate Chicago flood litigation, it was clear that both the city in both cases had the discretion, one, to move the location of the pilings, and two, in Cabrera, to approve or not approve an unsafe condition, or what they thought may be an unsafe condition, that did not relieve the contractor of their duties. That's the same language we have in our case. Answer Judge Mc this question. Well, I believe the discretionary act would be the language of the contract based upon Cabrera and in Chicago flood litigation. That's not really an act. Where's the act? The act in this case is Mr. Ford testified in this deposition. He walked this site every day. And he would view things for the progress of the work in general. Did he know that these ladders were there? No. Were these ladders seen by other people? Yes. And he did not do anything. It's like the justice said earlier. He didn't take any action because he didn't need to take any action. Safety and means and methods were up to the general contractor in this case. So therefore, he didn't take any action. That was his discretionary act. He had the ability under the contract language, Your Honor, to either allow it or not allow it. He allowed it. By doing nothing. By doing nothing. If you're going to allow something, you're not going to stop. Non-action can be action. Right. It's an omission, and that's what he did. Mr. Ford's omission of not correcting this situation is what caused this accident. Whether he knew about it or made a conscious decision or not, that's your position. Correct. Because he did walk the site. He just didn't have a specific memory of this. So this engineer could have stayed home for nine months, never visited this job site, and exercised his discretion, according to you, because he was never there and he never knew it. He could have gone to the site, but he decided not to go to the site and not inform himself of what he could have learned, but he decided not to learn. He had to go to the site, Your Honor. Yeah, but under your theory, what I just heard, he could have stayed home and done nothing because he didn't know, so what's the difference? Well, no, that only goes to a safety issue. If you look at the contract language, safety and means and methods were delegated down 100%. Isn't this a mean or method to get into the bottom of this tank? Yes, it is. Okay. Okay. And the other thing you have to look for is whether or not this was a dangerous condition. There's no pleading, there's no fact-pleading in any complaint, specifically the secondary complaint, that anybody from the MWRD knew that this was a dangerous condition. For liability to attach, you have to have knowledge of some, the condition is going to lead to an injury, it's going to be hazardous. There's no testimony, there's no feeding to that effect. And if you go back to the cases cited by plaintiff, you're looking at, like, the pothole case, the fire drill case. Those are where people are actually there and they're performing an act. So you can see what their discretionary action is, like placing that lady next to the door. In this case, we have an omission. We have contract language, according to the Chicago fed litigation, that says, look, you can or you cannot do that. He decided not to. As Justice said earlier, what is he supposed to do, write a note saying, I'm not going to change this even though I consider it to be unsafe? If he didn't even know it was unsafe, if he didn't know about it. But that's also not, I don't believe that's an issue in the case, Your Honor, because whether or not it's unsafe or not, that would be for the general contractor, the LLC, to take care of, not the MWRD. Based upon the contract language, that falls, delegated down to passion, not MWRD. You're, I think, trying to put a duty on the MWRD that it does not have under the contract. So you're saying under the contract, if they know about a dangerous condition, they have the authority to stop it, don't they? They may stop it. Yeah, they have the authority to stop it or not. If they wish to, yes, they don't have to. So here, the district can do nothing and get away with no liability on anything because we decided not to inform ourselves. Is that the position? It's not my position. I'm talking about this specific instance with this lot of configuration. Yes, when it comes to this lot of configuration, the contract language allows them, it says may, tell the contractor not to do that. It doesn't say he shall. It does not give him the absolute duty to do that. And I think that's the distinction. So I'm a little confused. What is your position as to whether this ladder violates OSHA or the contract documents? It doesn't violate either one of them, Your Honor. So then how would they use discretion? Now, aren't we getting into Monson? If it doesn't, then how are they using discretion because that's the immunity you're claiming here is discretion. He saw it. It was there. He walked the site. He doesn't have a specific memory about whether or not seeing it or not. He said he didn't inspect. He doesn't remember inspecting it. He doesn't remember inspecting it from a safety standpoint. The other people have testified that MWRD employees saw that. MWRD employees talk every morning before they were sent out to do their job on the project. So I think the evidence shows that there was knowledge by the MWRD of this ladder configuration. Mr. Healy testified that that ladder configuration was used at least six times before. There were no accidents. There were no injuries. So I don't know that you have to have an unsafe condition before you go into the discretionary. It says if there are making a policy decision or doing a discretionary act, his discretionary act is walking the site, seeing this, and allowing it because he has no knowledge that it's unsafe because there's nothing pledged to say it's unsafe. There's no evidence to show that it's unsafe. Where is the evidence that there's some balancing of competing policy concerns? Isn't that what discretion and policy is about? Where's the balancing? Where's the evidence of that? Discretionary acts are those unique to a particular public office. In this case, it would be unique to the MWRD. And they're building a sewer plant. So they've got to make decisions about how big is it going to be. That's all done. And then they're walking and they're going to see to make sure that that project is built according to the plans and specifications. That's their role on this project. All right. And it used to be back in the day that you draw a distinction, a nice clean distinction, between we're going to start the project and this is how we're going to do the project. And once you get into the actual implementation, you're out of the tort immunity. Right. But I agree with you. That distinction is gone. I think what you're talking about is the City of Chicago. That's the case there. Well, they decided to put up light poles, and they did put up light poles. And then they later let the light bulbs, you know, black out. They had a duty to go and fix those light bulbs. We were in the middle of this project. Our duty during the middle of this project is to make sure the people in the Cook County get the project they're paying for. The means and methods of how this project is being done, i.e., are they going to use this ladder configuration to go down in this hole? It is the floor chamber. It is up to the general contractor. That's very clear from the contract language that we cite in our brief. Okay. Now, if you look at 2201, it says you've got Mr. Fort is there every day of the week. He has to be. He can't go home for nine months, Your Honor, because he has to make sure that the clearance and specs are there. I know. I know. But he has to be there because he has to know that to do his job as a resident engineer, he has to determine that they're doing the job that's required by the clearance and specs. Now, so if the rules, et cetera, are part of the contract that the contractor says they will follow, that's a mandate on the contractor, not on the MDO. That's pretty ministerial, what you just described. Making sure that it meets the specs, that's all ministerial. Except for the fact that we have biweekly progress meetings, Your Honor, and those documents were part of the record on appeal. And you can see from that that there are 18, 19 pages of items that are brought up every biweekly progress meeting that Mr. Florek had to make a decision on. He was making policy decisions and he was making discretionary decisions on a biweekly basis on this project. If he walked the site to see the progress of the work and something wasn't done correctly according to plans and specs, he had to make the decision as to whether or not to say, you know what, we're going to allow that with a change order or you're going to have to change that. So there were policy decisions being made on a daily basis along with discretionary acts by Mr. Florek, by every MWRD employee on this project. As you remember, the inspectors, they were out there every day determining whether or not the work being done was being performed the way it should be done. And if it wasn't, they had to make a decision, a policy decision in a discretionary manner in how they were going to deal with it, if they didn't think it met. Like the Florek Chamber, when he was down there, they grouted it and they did the weather test and the weather test didn't hold. The MWRD would be responsible for making a policy decision and a discretionary decision as to what to do at that point in time. It would not be up to the general contract. Every issue on this case, on this project, would be that way. Would you address Monson and, you know, I'm just a little bit confused because in your brief, Sanchez says he wasn't aware of any work in the area within seven to ten days of the accident and he had no reason to be in that area. And Monson talks about the city there, in that case, had to present evidence documenting the decision not to repair the sidewalk at issue and so that would not be discretionary. How do you... I'm sorry, in the Monson case, they held that there wasn't evidence that they made a decision to... Right. ...repair that piece of sidewalk. And that's what I said earlier. Right, why they didn't repair it. And I guess what I'm saying is that that line of cases is different than Chicago flood and Cabrera because this is a construction case where the courts, the Supreme Court and the Appellate Court, have looked to the contract language to see where the discretionary acts and the policy decisions are being made. So you're saying that the law is different in the world of construction contracts? It seems to be that the court is... In those two cases, if you look at, as I said earlier, the fire marshal is making a determination. He was actually there doing a fire drill at the time. The guys were out there actually making, filling potholes, making a determination of what potholes to do. There's people in there on a specific act. Monson's the same way. In this case, we have a construction project in whole. And I think the court, the courts, the Supreme Court and the First Appellate Court have said, look, you've got to go through the contract documents. Look at Cabrera. It says they may tell you not to do that unsafe act. They don't have to. And some of the judgment was granted. You look at where Chicago fell. They said they could move the area where the piles were going to be driven, i.e. discretionary immunity under 2-201. I believe they're analogous to this situation, Your Honor. That the right to take action under the contract turns inaction into a discretionary act? Is that essentially what you're saying? Yes, to a certain extent. Yes, it does. Because you really, it's like trying to prove a double negative. You really can't because you can't prove an omission. Because if he says, you know, I walked in, and if he thinks it's safe, is that something he's going to remember? No. Or if he doesn't have a concern about it, is that something he's going to remember? He's running a $223 million project. That's a little issue that he could probably have seen a dozen times. And just because he doesn't have a clear memory of it doesn't mean the contract language is not supposed to be followed like it was in Cabrera and in Ray's Chicago flood litigation. Now, I haven't read the 3108, the supervisory. I didn't really quite understand what he's saying, non-supervisory and supervisory. 2-2111 doesn't make that distinction. As for 1-3111. It doesn't make the distinction between construction contracts and other cases either. It doesn't make the distinction. That's what I'm saying. It seems like the courts in those two cases, Cabrera and Chicago flood litigation, have made. They had to apply the facts as they were. The facts were based upon a construction contract, and that's what they looked to. In the other cases, they could actually look to the actions of the people involved because there was a specific item that they were talking about at that time, the sidewalk in Monson, the pothole. The 3108. We just don't believe that they show any willful want. They have to show. Do you disagree that if the contract, if there's no negligent liability toward immunity, there's also no willful want? Correct. I think Thinley flood makes that clear. Monson makes that clear. Yes. Yes, I agree. And I just don't think based upon the case law that they show any willful want. They don't show any knowledge or plead any knowledge by anybody from MWRD that this was a dangerous condition or a dangerous ladder situation. There's not one, and it's on a second amendment complaint now, Your Honors. There's just no allegation whatsoever, and they can't plead that allegation because no one has testified that this ladder configuration was dangerous or unsafe and was going to lead to serious risk of injury because the facts show that's not the case. It's used at least six times before, no injuries, no accidents. Flood's not overruled. Cargate Bargains gives you another way of looking at it. They say, look, 3109, it already tells you it's a hazardous condition. We know that. That's a given because that's the title to it. And then they say you can look to see what they did to abate that hazardous condition. Well, they went through and they didn't find anything that was willful want in the car. If you look at our case, there's not one allegation pled. In any way, shape, or form, it shows we acknowledge that this was an unsafe condition or that it would lead to an unreasonable risk of serious injury. And therefore, I think Judge Gamowitski's order should be upheld. Thank you. Thank you, counsel. Thank you. 2201 is a statute that applies to all cases, whether it be a city pothole case, a district pool case, or a construction site case. There's no distinction to be made. This thing about the MWRD being a unique public entity doesn't matter in the eyes of our Illinois legislature. 2201 is across the board for all local public entities. Now, I want to stress this, that we allege in our complaint should have known. They had people out there who should have seen the unsafe letter but didn't. We allege that.  The reason I'm saying this is because Judge Folk said so. No one did anything about it, and there's no showing that anyone exercised discretion. Therefore, under Monson, there's no discretion or immunity. Well, I should have known, though. How does that comply with the contract provisions that put all of the safety requirements on the contract? The contract, Justice, I think that issue is restricted to the supervision. I'm talking about failure to replace, failure to warn, and all my other sub-allegations that are discretionary, not supervisory in nature. And the Folk case makes a clear distinction between supervisory allegations, which can be controlled by a contract like we have here, and non-supervisory allegations where you look to the act of the employee, and it's a fine, fine distinction. But I think there's no immunity here. We say that this knowledge of the configuration does not equate to discretionary immunity. To get to immunity, the MWRD needed to show that Folk knew or should have known the configuration, he weighed policy considerations, and he made a conscious decision not to either warn people of this homemade ladder that could go down 29 feet, a dangerous condition, or not. Knowledge does not equate to immunity. I do want to talk briefly about the notice requirement. Justice, the trial court in its 414 ruling said we pled a valid cause of action without pleading or other cause of conscious disregard for the safety of others. And I think the Bow case, the Supreme Court is right on point there. We don't have to plead actual notice. I think they're wrong on the law on that. I have to be blunt about that. But I do want to say this, and I'll finish up. The granting of the summary judgment here misapplied the Cabrera holding to immunities for non-supervisory allegations. Cabrera is a very limited case. I don't think it's been cited since Justice Gordon wrote it. But if you read that opinion, there's 20 pages, and there's more pages about Inouye, Chicago, Fred, that opinion, and then the appellate court said this makes a leapfrog into the holding as to the contract. There is no hair and neck analysis. But when you look at Inouye, Chicago, Fred, yes, there is an Inouye hair and neck as to the non-supervisory allegations. There's no showing here by the MWRD that any of it's in place.  whether any of the non-supervisory allegations as required by the statute ever made a conscious policy decision to allow or reject the letter of configuration in use on the property. Counsel, I do have one question. At what point, if you can recall, did the court get rid of the supervisory allegations? When was that ruling made approximately? I believe it was April of 2014. Okay. And then one year later. Was there a motion to dismiss? There was a motion to dismiss. There was a 2615 motion. Okay. And then we had the 2619A9 motion where the court denied summary judgment on all of the stuff about that, the 414 issues between the MWRD and the contractor. So there's questions of fact. There's plenty of questions of fact for the jury on that. And then he also said that there's enough notice pled. He stated in that ruling that there's enough notice pled there. So I believe for all of the above reasons, we respectfully request that you reverse the case and remand it on both the discretionary, the tortimony issue as well as the supervisory issues. Thank you. Thank you. Thank you. Thank you both. Thank you all. This was very well briefed. This is really complicated stuff. We appreciate the excellent breaking and arguing. Are we ready on the third case?